UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| UNITED STATES OF AMERICA<br><br>v.<br><br>PATRICK DOLAN | Criminal No. 1:25-CR-10315-NMG-1 |
|---|---|

**DEFENDANT PATRICK DOLAN'S SENTENCING MEMORANDUM**

**INTRODUCTION**

The defendant, Patrick Dolan ("Mr. Dolan") now comes before the Court for sentencing, as the final step in his efforts to take full responsibility – and to be held accountable - for what he himself recognizes as his knowingly "shameful" and criminal conduct. Those efforts began before his conduct had fully come to light in late April 2024, and before any law enforcement or other oversight authority had contacted him or had even become aware of his conduct. On April 18, 2024, through counsel, Mr. Dolan contacted the Office of the Massachusetts Attorney General ("AGO"), and the Massachusetts Office of Bar Counsel with an oral self-disclosure, and with the express plan to follow-up those initial communications with more formal ones (see, Letter from Attorney David Meier to AGO at Exhibit 1).

Knowing that as a result of his self-disclosure the Board of Bar Overseers would find him unfit to continue the practice of law, on Friday April 19, 2024, Mr. Dolan appeared in Middlesex Superior Court with an *ex-parte* emergency motion to continue a trial he was otherwise scheduled to begin on the following Monday (a copy of that motion is at Exhibit 2). Since that appearance (which was for sole purpose of discontinuing the practice of law) Mr. Dolan has not engaged in the practice of law.

On May 3, 2024, Mr. Dolan voluntarily appeared at the AGO – without protections or conditions – to make a tape-recorded self-disclosure and to answer any and all questions put to him by two Assistant Attorneys General, and an assigned detective from the Massachusetts State Police. On May 15, 2024, Mr. Dolan submitted a written, "voluntary disclosure of misconduct" to Bar Counsel (that disclosure letter is at Exhibit 3). Following the completion of Bar Counsel's investigation, on June 29, 2025, Mr. Dolan submitted a sworn "Affidavit of Resignation" to the Massachusetts Board of Bar Overseers (Affidavit at Exhibit 4). That Affidavit was accepted, and on September 4, 2025, the Supreme Judicial Court of Massachusetts entered a "Judgment of Disbarment" against Mr. Dolan, whose name was then immediately stricken from the Roll of Attorneys (the Judgment is at Exhibit 5).

On March 28, 2025, Mr. Dolan voluntarily appeared (with counsel) at the U.S. Attorney's Office to continue his self-disclosures and to answer any questions put to him by the AUSAs and government investigators. Thereafter, on July 15, 2025, Mr. Dolan executed the subject plea agreement. On October 17, 2025, Mr. Dolan appeared before this Honorable Court and formally entered his guilty plea, which the Court accepted. He now comes before this Court for the imposition of sentence, and provides the following information, not as an excuse or even as an explanation of his crimes, but as context, which the court can fairly consider in determining a fair and just sentence.

## PROPOSED SENTENCE

For the reasons set out more fully below, Mr. Dolan respectfully requests the Court impose a sentence of 41 months of confinement; with 12 of those months to be served in prison and the remainder to be served in home confinement. In applying the factors set forth in 18 U.S.C. § 3553(a), we respectfully submit that the Court will find such a disposition is "sufficient

but not greater than necessary" to achieve the goals of sentencing, given (1) Mr. Dolan self-disclosure and cooperation with law enforcement and the bar; (2) his family circumstances in which he is the primary care giver of his widowed, elderly and frail mother; (3) the need to avoid unwarranted sentencing disparities among similarly situated defendants, and (4) the substantial collateral consequences of the criminal convictions and imposition of a sentence.

Mr. Dolan's self-disclosures and cooperation with law enforcement have been detailed above and need not be repeated here. The court should also be aware that Mr. Dolan has not filed any objections to the PSR, nor does he challenge the PSR's guidelines/offense level calculations. As reflected in the PSR (at paragraph 83, pages 14-15), both the average and median length of imprisonment for 391 similarly situated defendants during the past five years whose primary guideline offense was sec. 2B1.1, with a final offense level of 24 and a criminal history category of 1, was 41 months. According to the PSR, the only defendants excluded from those calculations were those who received a 5K1.1 substantial assistance departure. In other words, those calculations include defendants who went to trial and/or who plead guilty on the eve of trial, after lengthy and costly investigations. Regardless, it is hard to imagine a defendant who more quicky and intently sought to accept responsibility for his conduct, or who cooperated more fully and completely with a variety of law enforcement and other government investigative authorities.

**<u>FAMILY CIRCUMSTANCES</u>**

Patrick Dolan is not only a 60-year-old man with no prior criminal record who self-reported his crimes and fully cooperated with the investigation of those offenses. As reflected in both the PSR (at paragraphs 53-54) and in the letters attached at Exhibits 6,7, and 8, he is also the primary caretaker of his frail and elderly (86-years-old) mother, Susan Dolan, with

whom he lives in North Attleboro, Massachusetts. Mr. Dolan's father – former Massachusetts District Court Judge John Dolan – passed away in 2021. Mrs. Dolan's seriously compromised medical condition – which includes Posterior Reversible Encephalopathy Syndrome ("PRES"); chronic hypoxemic respiratory failure in setting COPD; frailty; and impaired balance, gait, and vision are well described in the PSR at paragraph 53 and in a letter to the court from Dr. Justin Loew, her primary care physician (Exhibit 6). Moreover, as noted by Dr Loew, the symptomatology associated with those conditions is progressing and will continue to limit Mrs. Dolan's ability to independently complete day-to-day tasks. In his letter, Dr. Loew specifically addresses the critical role Mr. Dolan plays in maintaining his mother's health:

> Her son Patrick Dolan helps her with all [] activities which enable her to remain in her house. If he were imprisoned, I fear that she would fail and likely need to be placed in an assisted living facility.

Dr. Loew's concerns are echoed by Mrs. Dolan's close friend, Suzanne Nordstrom, who is a retired nurse. Indeed Ms. Nordstrom and Mrs. Dolan met when they worked together as nurses at Sturdy Memorial Hospital. In a letter addressed to this court, Ms. Nordstrom writes, "I am terribly concerned for Sue's safety without Patrick's caregiving". Ms. Nordstrom's letter is at Exhibit 7. The depth of that very real concern about Mrs. Dolan's health is perhaps best expressed by Mrs. Dolan herself, who writes in her letter to this court:

> Patrick has lost virtually everything, perhaps deservedly so. If he is incarcerated I will lose my caretaker and will likely have to go into a facility. I hope you will consider this as you consider what sentence to impose. I trust and believe you will use your best judgment.

Mrs. Dolan's letter is at Exhibit 8.

Notwithstanding those very real concerns, the family believes that they can gather the financial and physical resources to provide a level of caretaking services that would allow Mrs. Dolan to be able to stay in her home – without Patrick as her caretaker – for about a year. Our

sentencing recommendation – of a year of imprisonment followed by two and a half years of home confinement – was crafted with those concerns and that remedy in mind.

As referenced above, the proposed sentence fairly accounts for sentences imposed upon similarly situated defendants, even without consideration of Mr. Dolan's extraordinary family circumstances. However, even before the recent guideline amendments removing the 5H factors, this court has long recognized that family circumstances that are "unusual" or "not ordinary" can and should serve as a basis for a sentencing variance in the defendant's favor. *United States v. Rivera*, 994 F.2d 942 (1st Cir. 1993).

**PERSONAL CIRCUMSTANCES**

It is equally fair to now consider Mr. Dolan's personal circumstances in fashioning an appropriate sentence. Simply put, by the time Mr. Dolan began criminally abusing his IOLTA account, his personal life had spiraled completely out of control. The details of that are best described by Mr. Dolan's own words, which are contained in his self-disclosure letter to Bar Counsel (Exhibit 4). By way of summary, his first marriage had fallen apart largely as a result of the financial strain of living beyond their means. Which is not to say that they pursued a lavish lifestyle, but rather that his income as an associate at a string of law firms, could not sustain the cost of living in a modest home in Belmont, and sending his 2 children to private school. Even as he sought to maintain the appearance of a reasonably successful attorney, the financial strain he was experiencing caused his work to suffer, which accounted for him moving from job to job. Throughout this time, both he and his wife tried to shield as best they could their marital and financial woes from the children. However, at some point Mr. Dolan took to sleeping on a sofa in the basement and by 2014 he had moved to his parent's home in North Attleboro. Meanwhile, he was having difficulty making mortgage payments which ultimately led to foreclosure

proceedings in 2015. At that point, his wife's uncle came to the rescue and purchased the mortgage. However, as part of that arrangement Mr. Dolan sold his interest in the property (which had about $350,000 in equity) to the uncle for one dollar. As reflected in the PSR (paragraph 55) that marriage ended in divorce. Although Mr. Dolan remarried in 2019, he has been estranged from his second wife since these matters came to light in early 2024.

Between 2010 and 2016, Mr Dolan was employed at a variety of small, essentially siloed firms (and for some periods he was unemployed). In 2016, he and a colleague from a firm that folded formed Cornell Dolan P.C., which was also a very siloed practice. Specifically, they shared revenue on only a few contingency fee cases which they worked together, and each maintained his own separate IOLTA account. Business was not good; there was no brick and mortar office and Mr. Dolan spent most of his working hours in Starbucks or similar work-friendly venues. When he wasn't staying at his parents' home, he often slept in his car at a rest stop on Route 128, all the while trying to maintain an appearance to the outside world - and to his children – as a reasonably functioning lawyer with a small private practice.

In 2018, Mr. Dolan's financial condition was bleak, and he has acknowledged in all his self-disclosures that he almost immediately began to access the DiGiovanni funds when they were deposited into his trust account. It would be far too glib to suggest that it was never Mr. Dolan's intent to permanently deprive the DiGiovanni's of their funds. Rather, he simply deluded himself into believing that one of his large contingency fee cases would hit, and he would redeposit the misappropriated funds.

What is worth noting is that money lust was not Mr. Dolan's motivating factor in taking those funds. Indeed, this case isn't about a lawyer taking client money to make expensive self-indulgent purchases, to take lavish vacations, to gamble or to buy drugs. Rather, it is well

documented that the funds Mr. Dolan took were used to pay nuts-and-bolts expenses such as health insurance premiums, college tuition, and home maintenance. The most expensive purchase was a used car for one of Mr. Dolan's sons. Meanwhile, throughout that time, Mr. Dolan himself was driving a 2008 Toyota Highlander with over 200,000 miles on it.

As reflected in the PSR, the misappropriated funds are gone, and Mr. Dolan is without means or resources to satisfy the need for restitution. However, with the assistance of family, he had made a payment of $153, 220.71 to satisfy the forfeiture amount tied to the home of his second wife, which will also allow her to continue to live in that house. Also with the assistance of family, Mr. Dolan is currently prepared to pay an additional restitution amount of approximately $46, 000, and hopes to make those arrangements in advance of sentencing on March 10.

All crimes have collateral consequences for the defendant, but it must be noted that those consequences are particularly apparent and onerous here. Mr. Dolan devoted his young life and education to follow in his father's footsteps and to pursue the practice of law. Both that goal and that profession are now forever lost. Worse still, is that he has brought shame to a family that previously was known to meet the highest standards the profession had to offer.

In order to demonstrate Mr. Dolan's commitment to taking full responsibility for his misconduct, this memorandum has necessarily focused on the negative. But it would not be fair to him to fail to mention the many fine qualities possessed by this man who has no prior criminal record or discipline. First and foremost, there is his devotion to caring for his mother. Some of that is described above, but it is best described by Mrs. Dolan herself. Her 3-page letter to the court is at Exhibit 8, and it bears reading in its entirety.

Mr. Dolan has also consistently demonstrated his commitment to his community and to assisting its underserved members. Mr. Dolan was a volunteer at the Hebron Food Pantry in Attleboro. As referenced in her letter to the court (Exhibit 9 to this memorandum). Heather Porreca – the President of Hebron's Board of directors - writes:

> What stood out most was not simply his work ethic but his character. Patrick treated every client and volunteer with dignity and respect. He understood that at a food pantry, small moments matter: a kind word, a calm presence, a willingness to do the hard or unglamorous work without recognition. He embodied those qualities consistently.

Finally in this regard, there is the letter to the court written by Mr. Dolan's son Leighton, which is at Exhibit 10. There are no excerpts that could adequately serve as a substitute for the entire letter. What can be said here is that Leighton conveys just how successful Patrick Dolan was in not letting his struggles and troubles interfere with a fatherhood that instilled work ethic, integrity, family, and love in a very grateful child.

## CONCLUSION

There is no dispute that Mr. Dolan 's criminal conduct is serious. There is also no doubt that he has accepted full responsibility for it and is now prepared to accept the consequences. In fact, it is Mr. Dolan's intention to directly address the court himself, to personally convey both his accountability and his remorse. Finally, it is respectfully submitted that the recommended sentence of 41 months of confinement – 12 of which to be served in prison – is "sufficient but not greater than necessary" to satisfy all the goals of sentencing.

PATRICK J. DOLAN,

By his attorneys,

*/s/ Paul R. Cirel*
Paul R. Cirel, BBO #084320
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
pcirel@toddweld.com
617-720-2626

March 6, 2026

**CERTIFICATE OF SERVICE**

Undersigned counsel certifies that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

*/s/ Paul R. Cirel*
Paul R. Cirel

Dated: March 6, 2026